Am I correct that you will argue the part here in the courtroom and then Mr. Bachrach will argue the part that will go into classified session? That is correct, Your Honor. Okay, and you're going to use five minutes for your main argument and reserve two minutes for rebuttal? That is correct, Your Honor. We're gonna take all of that before we go into closed session, okay? I'm aware of that. Thank you. Just just so that we all know. May it please the court, Chief Judge White represent Mustafa Kamal Mustafa on this appeal. We are his representatives, but we are also the representatives of our system of justice to ensure, as Justice White wrote 45 years ago in Chambers v. Maryland, that Mr. Mustafa received due process, a fair opportunity to defend against the accusations. We submit in this case our system of justice failed and he did not defend against the accusation. I will begin with point four because that point relates to the errors that prevented Mr. Mustafa having a fair opportunity to defend himself and touches on the on other points that are as important. In this case, the the evidence presented against Mr. Mustafa was varied and that were in many ways bombastic, rhetorical, anti-American, anti-Western, anti-Jewish. So most of which did not include any comment by Mr. Mustafa. However, the court allowed that evidence to come in and there were 25, at least 25 limiting instructions related to the admission of that evidence. We had, we believe that there was a double standard in the admission of evidence and the three most important ones were evidence that either would corroborate much of Mr., some of Mr. Mustafa's testimony or made it impossible for the juror to view Mr. Mustafa as a credible witness. More significant or perhaps multiplying the significance of those errors was the government's use of these decisions, some evidence, and the government used it as a sword, frequently as a sword, to take advantage of those decisions. Some of them are very, very simple. Mr. Mustafa was in prison for many years in Britain before he was brought to the United States. In the United States, he was held in, alone, without contact under severe restrictions. This was a man who was used to speaking to large audiences. The court prevented counsel from questioning and eliciting from his client the solitary confinement, the severity. You're talking about solitary confinement insofar as it may have interfered with his ability to communicate, is that what you're saying? It has much more effect than that. And the law and the experts, and I don't think there's any dispute that the impact of solitary confinement on one's mental skills are known and clear. And not being able to have regular contact with people, and very, very limited contact at that time, does impact one's ability. And as I set forth in our testimony, there were a number of times where just words just rolled out of Mr. Mustafa's mouth, because this was the one time he had a chance to talk. It does have largely to do with communication. It has to do with, absolutely, his ability to communicate as an effective witness. I know that soon after his testimony started, counsel and the court engaged in a colloquy that had not, in fact, materialized. Did I misunderstand that exchange? I believe so. I believe that some of the concerns initially in the direct examination did not appear to defense counsel. But that is different than what happens, transpires during the course of someone's testimony, when they are being asked questions that they haven't been prepared for, and they have to rely on their own ability to remember, their ability to fully put together the answer. And it became clear on cross-examination, I think, that the impact was problematic. But what really, I think, caused these problems, or made this worse, was the government then gets up on summation and says, oh, he's telling you lies. He's a speaker. That's how he earns his money. He had ten years to prepare his lies for you. When, in fact, those ten years made it even more difficult for him to express himself. So the government took advantage of that. The government also took advantage of where the defendant assisted the British intelligence, when the British intelligence asked him to be a peacemaker. Before you move to that topic, one more thing on the solitary confinement, let me ask you so I know your position on it. There was also a suggestion in the record that the court did allow you to elicit from the defendant that he had not spoken to more than one person at a time for some extended period. Tell us why you don't think that was adequate to argue to the jury that that was an impairment of his communication abilities. I think that the general knowledge within a jurors' ken is that solitary confinement impacts in many, many ways. But even solitary confinement, he did have some communication with visitors. I mean, yes. I understand that. To the extent it was how the compromise the court struck was to allow it to be elicited that he wasn't able to speak to more than one person at a time, I just need to understand why that wasn't enough to make the point you want to make. Solitary confinement gives a picture to the jurors. Saying that he only had, he only could speak to one person at a time or two people, I think it was one or two people at a time, presents no picture, no background facts, nothing within a jurors' understanding of what the significance of that is. It really draws out nothing for them. And I think that it would have been very simple to have explained when, to respond to the government's claim about him being such a good speaker, etc., to be able to have said, hold it. He may have been a good speaker in 1998 or 2002, 2004, but he's been in solitary confinement. You have to look at him testifying as a person who was in solitary confinement, you know, during this period of time. And that would have presented a different argument in response to what the government then did in using his earlier ability as a speaker against him. I want to let you make a few other points and your time's up, but I want to, we'll give you time to make a few more points. As to the British intelligence issue, it was, to some extent, I understand, a relatively close call whether or not on direct examination he should have been able to testify as to that. I think that there was sufficient inferences being drawn by the government's case that they were not going to, they were going to make fun of and dispute him being a, quote, peacemaker as the opening, at times, a peacemaker as the opening statement stated. But by cross-examination, it was clear that the government was denigrating and mocking Mr. Mustafa at any time as a peacemaker. The importance of this is right there in the Yemen count, where he's talking on the phone after the kidnapping, and he's claiming that he's trying to help defuse the situation so nobody gets hurt, and the government is making fun of him that that's what he's trying to do because of all these other speeches that he'd made over time. While a month and a half earlier, the records show, and Mr. Mustafa would have been able to testify, that the British intelligence agencies came to him and asked him to cool the hotheads, to be a peacemaker, to defuse a dangerous situation, six weeks earlier than the Yemen, and he was unable to bring that out. So when then the government goes into, again, on summation, mocking his claim to be a peacemaker, and specifically talking about how he's lying to you here and making it very clear that they are talking about a recent fabrication and recent being after his arrest, not necessarily recent shortly before the trial, mocking him in that way when there was that one piece of evidence that defense could have then responded to and say, no, he admitted that he made these bombastic rhetorical and pretty horrible statements, anti-Jewish, anti-Western, anti-American, but he did at times act as a peacemaker, and here's an example of him acting as a peacemaker. I understood your argument. You said that the British authorities came to him six weeks before the incident in Yemen occurred? Is that what you're saying? Yes. So it wasn't in connection with the Yemen incident that he was being asked to be a peacemaker? No, it wasn't. Right. But the government did not just challenge specifically whether he was a peacemaker in Yemen. They challenged his testimony completely that what he did was try to maintain credibility with some of the radicals and act as a peacemaker at times when it was necessary, and they attacked that part, and attacked it as a recent fabrication. At that point, it became absolutely admissible to challenge the government's position. They opened the door as wide as possible to allow it. Defense counsel asked, renewed his application after the cross-examination to go into it on redirect, and it was denied, even though the district court said, understood that, you know, a recent fabrication opened the door. He was not allowed to go into that. And then finally, the other point was notwithstanding, if I may go back, and notwithstanding the admission of the evidence against Mr. Mustafa and as to his beliefs, right, the court allowed the prosecution to bring out his prior convictions in Britain that sounded quite similar to the charges in this case, solicitation for murder, threatening, abusive words of behavior, and of those type. And they did it on a basis where I submit had no validity whatsoever, excuse me, on bases that had no validity whatsoever, and some of them were even in bad faith made by the government. The fact that they used the term impeachment by contradiction as one of their theories in supporting it in their brief, I think demonstrates that there is really was no basis to allow that. Because impeachment by ---- Tell me out on how this all evolved, Mr. Schmidt. As I understand it, it started with the government arguing that your client by suggesting that he had been held this lengthy period of time on the U.S. charges had somehow created a misimpression for the jury. And that was what started us down the path of allowing the British conviction to come in? That was one. They presented a letter to the court. That was the start. Now, to the extent that the court might have allowed it to put in no, there were other charges in Britain, I gather that's not your argument. Your argument is about allowing the particular crime that he was in custody in Britain to come into evidence. Is that right? I think that a resolution that Mr. Mustafa was held in Britain on other charges and brought to the United States as a result of the extradition later on would have been one of the easy ways to have resolved that issue. I want to focus on your concern so that then the government addresses it. Is there anything else that we should take from that incident that you think adversely affected your client other than what the conviction was for in Britain? The government then at some point in its summation, again, then makes it worse by saying that, using it again, that he lied to you when he took the witness, Dan, that he was here eight and a half years. Knowing that their witness made the mistake and it was easily corrected, this could have been easily corrected,  the defense argued that he was being held only on this case when it was an obvious fact that it wasn't. So it was obviously, and it wasn't even that clear answer, that it was so. It was somewhat ambiguous, and they never even attempted to resolve that on cross-examination, which they easily could have, and they didn't do that because they wanted to try to find a way to get his prior record in. And they said, basically, he's... So they used that to challenge his credibility. They talked about him being the real Abu Hamza, is the one that did those things, not what he's saying here. So it seemed to me that the government used methods, strategic methods that the court allowed to bring in evidence that had really no purpose as to his credibility, especially because he admitted the statements he made in England. He admitted possessing the books that he had in England. He said that. He testified to that. So he did not testify any way differently  He admitted all of the facts that caused him to be convicted of the... I think we understand. Let's hear from the government, and then, of course, you'll have a chance to reply. Good morning. May it please the Court. My name is Ian McGinley. I represent the United States on this appeal, as I did below at trial. The appellant here got a fair trial, and that fair trial showed that he participated in three terrorist attacks, including one that left four civilians dead. As to the issue of solitary confinement because that was discussed, I just want to be clear on the record there. Not only did defense counsel acknowledge that the defendant testified well, he was fluid, he spoke well before the jury, the defendant himself said that. He was asked the questions by the court that the court permitted about whether you've spoken to a crowd in a long time. He said, no, but in fact, now that I'm here, I feel comfortable. I can articulate myself. I'm paraphrasing his words. But he himself admitted that. That was also the court's impression. The idea that adding the word solitary confinement would add anything to that, I think, makes very little sense. Smith, though, says that all of that exchange went on on direct and that cross was a different matter. Do you want to respond to that? I actually don't. I disagree because there was the defendant himself saying on direct that I feel comfortable here. He didn't say he felt more comfortable on direct or cross. That nothing was ever said to the contrary on cross. That's correct. By counsel or the defendant. That's correct, Your Honor. There's nothing in the record that contradicts that. And I think we have the record. The direct went on and the cross went on for quite a long time. I think the defendant expressed himself as he wanted to. And so I don't think, as a matter of fact, that he presented diminished at all. As to the statements that were admitted, those were the defendant's choice to make. The government was very judicious in the statements that it chose to admit at trial, tethering him to the counts, to the support for violent jihad and to the support for Al-Qaeda. And I think the district court, to its credit, was very careful. And each time it admitted these statements, it followed this court's dictates in Rahman to let the jury know that the defendant cannot be convicted for his beliefs and only that these statements could only be used for his intent or for other proper purposes. What is your response to the defense argument, the appellant's argument about eliciting on cross that he had been convicted in the United Kingdom of six counts of soliciting murder? What's your response to that? Two things, Your Honor. I think what triggered those questions were, one, that he did say on direct, he said, from then until now, meaning from 2004. I understand that. But I want to be very precise. And what I'm concerned about is soliciting murder has a certain meaning in this country. I mean, it could be you hired a hitman. It could be that you spoke to someone else about murdering someone. It has a certain meaning. I think it's reasonable to assume the jury would have attributed a certain meaning to the word soliciting murder or conviction of soliciting murder, six counts of that. And it appears that the conviction in the United Kingdom was actually regarding a hate speech type of factual scenario. It didn't involve him hiring a hitman. It didn't invite, it didn't involve him approaching someone and soliciting them to murder somebody else. And so I'm concerned that the jury wasn't informed of the difference between soliciting murder, as we might understand it in this country, and soliciting murder as it's understood in the United Kingdom. And so could you address that issue? Yes, Your Honor. I think the other piece of his direct that triggered why the naming the crimes was important was that he went on at great length about being a peacemaker during the time frame. But wasn't there much in the record that you already had? I mean, the countless speeches and so forth that went to the issue of really whether he was a peacemaker or whether he was an advocate of what bin Laden was doing and the mujahideen in Afghanistan? I mean, was it really necessary in order to rebut his peacemaker claim to bring out soliciting murder? And even if it was, what I want you to focus on is why wasn't it important for the jury to understand that soliciting murder or that crime in the United Kingdom has a somewhat different meaning than soliciting murder might be understood in this country. So I'm not really focused on whether it was probative or not, whether it was necessary to rebut his peacemaker argument. What I'm focused on is soliciting murder that the crime in the United Kingdom appears to be different than what we would understand or, more importantly, what the jury would understand soliciting murder to mean in this country. And the jury wasn't told and the government opposed the jury being told that soliciting murder in the United Kingdom has a different meaning than it might be understood as in this country. So that's my concern. And I appreciate that, Your Honor. I think to just your last point, the government never argued that it was otherwise at the same time. We did not say that he tried to hire a hitman or anything like that. I think it was somewhat clear to the jury from the nature of his job in the United Kingdom as an imam that those, I think it is fair that it was I think what the government objected to Yeah, exactly. And I mean, the other charge was inciting racial hatred. And so to the extent he's at the mosque and he's inciting racial hatred, I accept your point. But soliciting murder, that's what I'm struggling with. That seems like it's going beyond inciting racial hatred. It seems that it's taking it to a different, more extreme step. But it was not something that was dwelled on at trial, Your Honor. The question was asked. We were stuck with his answer. There was never any argument that he was soliciting other murders in the UK. But it was touched on in the summation. In the summation, you said, and I quote, in February 2006, he was convicted of six counts of soliciting murder. And he was convicted of inciting racial hatred. By the way, was there any evidence at trial that he was actually convicted of inciting racial hatred? I would have to just check the record. I don't think he fought on every question on that. I think he said, yes, but. I didn't see any evidence that at least in the cross-examination of Mustafa that it came out that he was convicted of inciting racial hatred. But my point is that it was important enough for you in your summation to bring out to the jury that he was convicted of six counts of soliciting murder. I think so, Your Honor. I think because of what he said during his direct testimony where he went on and on about how he was just trying to be a peacemaker and that his statements did not really mean what they meant because he was just trying to calm the situation. The problem is that a jury could think that he solicited the murder of particular individuals, as Judge Gardefee said, that he, you know, hired someone to kill them or did whatever. I mean, there's nothing to prevent the jury from thinking that this was a targeted murder plot that he got convicted of. Six times. Six victims. There was a chance for redirect by the defense counsel. I would have to check the record on whether they brought out whether how these counts related to his conduct. But hadn't defense counsel argued to the judge, the trial judge, that they should be allowed an opportunity to explain or lay before the jury that soliciting murder in the United Kingdom has a different meaning than how we would understand it in this country? I interpreted their argument as wanting to explain the legal elements of each crime to the jury, which I think the district court did not want to do because it would have confused the jury. So it was better for the jury to have a sense that he had been convicted of soliciting murder as opposed to he had been convicted essentially of hate speech. That was a more preferable outcome. Well, I mean, I think it was the fact of what happened, and he opened the door to it through his testimony. Why is that the case? Why did you need to ask more than that he had been convicted, that he was in custody in Britain based on convictions in Britain? Why was it necessary to elicit what for? It was because of the nature of what he said on direct examination. He said on the racial hatred, he said that he was brought into the Finsbury Park Mosque to soothe relationships between the different religious communities. Is that the ground on which you offered that testimony? I thought the evidence about the British convictions was offered to refute his suggestion that he had been in custody only on the U.S. charges for this whole time. Did I misunderstand that? It was through both, Your Honor. The court allowed you to do it on the other ground? We certainly briefed that in the letter to the court. And again, this was done with much care. We did not just go up there and ask him these questions. I'm not suggesting that you didn't give this thought and care, but the question is whether it was nevertheless error. I mean, to the extent you're arguing that he opened the door by suggesting that he spoke for benign purposes, you had all the other tapes and evidence in, so I'm not sure that you would have gotten this in. As a further piece of evidence, are you defending it here that you needed it as a further piece of evidence that his conduct wasn't always benign? Well, I think, just to Your Honor's point, I think the convictions went to the custody issue, one, and then... That's how I understood it. And also, I think, to this issue, whether we need it or not, it's hard to... To the custody issue, it's hard for me to understand why you needed to put in anything more than that he was in custody in Britain on British charges, no discussion of what they were. And I think it was both. That's how we briefed it to Judge Forrest under the factors, and I think it's the Hayes case. We said it was because of the false impression he left and because of his testimony about trying to calm violent situations. And as to whether we needed... You don't accept that you needed, that it was appropriate to let you go as far as you did. What's your fallback for why this is not an error that would warrant relief for the defendant? I think, Your Honor, because of the other overwhelming evidence of his guilt, including through which the defense does not... does not point out, which is the testimony of cooperating witnesses who committed the crimes with him, his co-conspirator statements from Kassir and Aswad who were there. And while we may have mentioned it in summation, it was not a focal point of the case. I have another question to ask you before we move to the other part of the case. There's a challenge to the defendant's 2339A convictions with respect to the transportation of Mr. Abbasi to Afghanistan. There's a challenge about adequate jurisdictional nexus to the United States. If I understood your brief correctly, you're arguing jurisdictional nexus based on... I'm forgetting the other co-defendant's name who came to the United States to raise money. Ujamaa, yes. Yes. Now, if I understand the record, he raised a trifling amount that he used to cover his own expenses, so not a penny of it went back to the fund at the mosque that then was used to finance Mr. Abbasi's trip to Afghanistan. I am not sure I understand how, if that's the only evidence, that gives you a jurisdictional nexus to the United States. Help me out. Well, I think the fact with the, and by the way, this was at the defendant's direction, so I think the fact that Ujamaa went for that purpose to the United States and he actually did come here and raise money is all that would be needed for the jurisdictional... Why is that? He wasn't directed to raise money for Abbasi's trip. He was directed to raise money for the fund generally, and I guess you could look at this as he failed, and so if he didn't raise any money in the United States, why is a trip financed for money that never had a U.S. link tied to the United States? Well, he certainly came here to raise the money and he got some money. Not for the Abbasi trip, specifically. It was just generally to raise money, right? For the Qajar fund, right? And one of the purposes of that fund was to send Abbasi to fight in Afghanistan. At the time that the go-raise money trip was made? I believe that was after Ujamaa had been instructed to take Abbasi at some point to Afghanistan, I believe. So the chronology is, first Ujamaa's told to take Abbasi to Afghanistan, and then he sent to the United States to raise money? That wasn't clear to me. I would need to check on that, Your Honor. I don't want to make that representation. Let's assume the worst case scenario for you, which is that there was no direction about Abbasi to Afghanistan before the trip to the United States. Do you still take the view that that trip to the United States is enough to establish the jurisdictional nexus? Well, if it was before there was any plot, I think that would be a difficult position to take. But  Ujamaa's testimony is actually, on direct, he did not say, I didn't give that money to Abbasi. On direct, he said that he believed a small portion did. On cross, he said he wasn't as sure. So I think there is enough record evidence of Ujamaa saying that this money went for Abbasi's travel. And in that case, whether it was before or after Ujamaa formed the agreement with the appellant, I think there's a jurisdictional hook. Why don't you give us a letter by Monday just telling us what the order was, whether the order was take Abbasi and then the raised money, or whether it's the other way around so that we don't have to hunt through the record for it, okay? Yes, Your Honor. Anything else on this point? No, Your Honor. All right. Thank you. Mr. Schmidt, you have a few minutes for rebuttal. Your Honor, I'd just like to deal with the issue of the claim of overwhelming evidence. Obviously, there's some credibility issues, but overwhelming evidence of some of the things that Mr. Mustafa is alleged to have done isn't contested. That's not the issue. The evidence that is an issue is, is there evidence to show that he had the specific intent to either aid al-Qaeda or aid in 1956, I think it is, conspiracy. The specific intent issue is what there can't be said that there's overwhelming evidence. In fact, the best person to talk about what one does when they go over to Afghanistan to train was their witness, Mr. Badat, who ended up being an al-Qaeda member. His narrative gives a perfect picture of what it means and what it doesn't mean to go over to Afghanistan to train. He made it clear. He went over at the request of his imam, Mr. Baba, who wanted him to set up a way so people from his group would be able to go over to Afghanistan, train to satisfy the Muslim obligations, and then return back home. And in fact, Mr. Badat said he planned to train, set that up, and then go back home to go to college, continue at college. In fact, so going to Afghanistan and to train does not mean terrorism. It does not mean it's for the purpose of joining al-Qaeda or joining or helping a 1956 conspiracy. I understand that, but at this point where we have to draw every inference in favor of the government, I would think that all of your clients' statements and actions together, that there's an argument for it being overwhelming evidence of an intent to support terrorists and al-Qaeda. How can you dispute that if we draw every inference in favor of the government? He's not charged with his opinions of what he wants to get done. It's evidence. But as the district court repeatedly told the jury, all these statements cast light on what his intent was when he sent people over. He wasn't simply saying I want people to fulfill their religious obligation. He was making all of the incendiary statements that you tried to keep out. No, no. He did state that it was for training purposes. There is nothing in the record there is nothing in the record that Mr. Mustafa  go over and fight with al-Qaeda. There is nothing in the record that says that he's ever said that he wanted people to go over and train to commit terrorist acts. There's nothing in the record. He's on record saying that people have to be trained for the front lines. Part of the training involved learning how to slit someone's throat. I mean, when those kinds of facts are viewed most favorably to the government, it's hard not to conclude that his intent was to support terrorists and al-Qaeda through acts of violence. First, he actually didn't say that. It was Qasir who said something like that. However, every single person... Not the front line statement. The front line statement is his. The training... The front line, Your Honor, is... Testified to by others. And all the witnesses says the front line is Taliban versus Northern Alliance. It is not al-Qaeda. There is nothing in the record that says front lines is al-Qaeda. Whether we're 2339 A or B. But the front lines does not mean a 956 conspiracy either. Fighting the enemy of the government of Afghanistan is not a 956 conspiracy. The point is every single witness who testified, every fact witness who testified on behalf of the government always said that, you know, we go to Afghanistan and if we're going to help our brothers, we're going to help our brothers. And that meant helping the Taliban. Every single witness. Ujamaa, Smith, the women, Badad, that all meant the Taliban. Even though we dispute that. But obviously, on the issue of whether or not it's overwhelming guilt or sufficiency, we don't argue that it's not true. But at most, it is from every single witness that it's the Taliban they're helping and Ujamaa himself said he never thought or would support al-Qaeda. So there was nothing there ever and it's a huge leap. It's a speculative leap and it's only drawn from the statements that he made, opinions, political opinions, not conduct, that some of the things that the terrorist groups did was okay Islamically. The jump from there to make an assumption that that includes when somebody's training where everybody says it's for Islamic purposes. ...so that judges don't go on like this. Abbasi is trained to a person who is an al-Qaeda trainer. No, he's not. He's not an al-Qaeda trainer. He is not an al-Qaeda trainer. He is an independent person and the testimony is... The evidence was, I'm sorry that I don't have the person's name in front of me, was that he was publicly acknowledged to have been involved with al-Qaeda training. He's lauded at his death for leading the battle in Afghanistan on behalf of al-Qaeda and that's who your client directed that Abbasi be taken to and of course in the end Abbasi does wind up in an al-Qaeda training camp. Which suggests that he's not, that the evidence can't support that inference is perplexing to me. Ten years after all this happened he's lauded by al-Qaeda. Ten years after and in fact he is, was in many ways anti-al-Qaeda. The thing was that in many of the camps you can go to one camp and then you can go to another camp. We're not fact finding here. No, I understand that but your honor is making a leap based on... Can I just ask you whether the jury could because you're saying that you're saying one it's not overwhelming and two in your briefs you say they couldn't even reach the... There was there was no evidence that Abbasi was being sent to that person for the purpose of becoming to help al-Qaeda. That's the issue. There is no evidence that supports that position and there certainly is no overwhelming evidence that supports that position. Thank you both very much for this part of the argument. It's now I'm told we should put this on the time on the docket. It's 11.22